UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEVEN EMERSON,

                            Plaintiff,

                                                        12 Civ. 8849 (TPG)

          -against -

CYRUS McGOLDRICK,

                            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT PURSUANT TO F.R.C.P. 12(C)

Alan H. Levine
99 Hudson St., 14th Floor
New York, N.Y 10013
(212) 739-7506

Beena I. Ahmad
52 Duane St., 5th Floor
New York, NY 10007
(212) 571-7011

Hussan Ahmad
Ahmad Naqvi Rodriguez, LLP
*Cooperating Attorneys for*
*CAIR-NY*
22 Cortlandt Street, 16th Floor
New York, NY 10007

Stephen F. Downs
26 Dinmore Rd.
Selkirk, NY 12158
(518) 767-0102


*Attorneys for Defendant Cyrus McGoldrick*
July 16, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................1

STATEMENT OF FACTS

    A. The Parties..........................................................................................2

    B. The November 19, 2012 Tweets........................................................5

    C. The *Holy Land Foundation Case* and the Term
        "Unindicted Co-Conspirator"...........................................................7

    D. The Meaning of the Tweet to a Reasonable Twitter Follower........................9

ARGUMENT

    I.      THE TWEET WAS NOT A FACTUAL ASSERTION
            BUT RATHER A MOCKING PRIVATE JOKE IN THE
            CONTEXT OF AN ONGOING POLITICAL PUBLIC
            DEBATE AND IT ENJOYS ABSOLUTE
            CONSTITUTIONAL PROTECTION................................................11

    A.      A Statement That is Not a Factual Assertion Cannot Support
           A Libel Claim................................................................................11

    B.      The Play on Words, "Unindicted Co-Conspirator" Here
           Signaled That the Tweet Was Not Intended Literally But as
           Mocking Sardonic Sarcasm.........................................................13

    C.      That the Tweet Grew out of an Ongoing Hostile Political
           Dispute Signaled That It Was Not a Factual Assertion, But an
           Opinion........................................................................................17

    D.      Readers Understand That Statements on Twitter (and Other
           Forms of Internet Communication Are Less Likely To Be
           Considered Statements of Fact...................................................22

    II.     THIS COURT MAY *SUA SPONTE* CONSIDER RULE 11
            SANCTIONS FOR A FRIVOLOUS COMPLAINT FILED IN
            "BAD FAITH".................................................................................24

CONCLUSION....................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases(s)**                                                                **Page(s)**

<u>Federal Jurisdictions</u>

*Bentkowski v. Scene Magazine,*
    637 F.3d 689 (6th Cir. 2011)..............................................................................21

*Egiazaryan v. Zalmayev,*
    880 F. Supp. 2d 494 (S.D.N.Y. 2012)..........................................................13, 17, 19, 20

*Finkelstein v. Wachtel,*
    2003 WL 1918309 (S.D.N.Y. Apr. 21, 2003)..................................................18

*Geary v. Goldstein,*
    1996 WL 447776 (S.D.N.Y. Aug. 8, 1996)................................................13, 15

*Global Telemedia Int'l, Inc. v. Doe,*
    132 F. Supp. 2d 1261 (C.D. Cal 2001)............................................................23

*Gollomp v. Spitzer,*
    568 F.3d 355 (2d Cir. 2009)..........................................................................24

*Greenbelt Co-op. Publ'g Ass'n. v. Bresler,*
    398 U.S. 6 (1970)......................................................................................12

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988).....................................................................................12

*Konikoff v. Prudential Ins. Co. of Am.,*
    234 F.3d 92 (2d Cir. 2000)...........................................................................13

*Lerman v. Flynt Distrib. Co.,*
    745 F.2d 123 (2d Cir. 1984).........................................................................15

*Levin v. McPhee,*
    917 F. Supp. 230 (S.D.N.Y. 1996),
    *aff'd,* 119 F.3d 189 (2d Cir. 1997)................................................................13

*Linn v. United Plant Guard Workers of Am., Local 114,*
    383 U.S. 53 (1966)....................................................................................17

*McGill v. Parker,*
    179 A.D.2d 98 (1st Dep't 1992).....................................................................17

ii

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990)...............................................................................12

*Netzger v. Continuity Graphics Assocs.,*
    963 F. Supp. 1308 (S.D.N.Y. 1997)..............................13, 14, 15, 22

*Obsidian Fin. Group, LLC. v. Cox,*
    812 F. Supp. 2d 1220 (D. Or. 2011)...........................................23

*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFLCIO v. Austin,*
    418 U.S. 264 (1974)..................................................11, 17, 18

*Pring v. Penthouse Int'l, Ltd.,*
    695 F.2d 438 (10th Cir. 1982)...................................................14

*Sanko S.S. Co., Ltd. v. Galin,*
    835 F.2d 51 (2d Cir. 1987).......................................................24

*Tedeschi v. Barney,*
    757 F.2d 465 (2d Cir. 1985)......................................................24

*United States v. Holy Land Found.,*
    3:04-CR-0240-P (N.D. Tex. July 1, 2009)...........................*passim*

*United States v. Holy Land Found.,*
    624 F.3d 685 (5th Cir. 2010)........................................*passim*

*United States v. International Bhd. of Teamsters, AFL-CIO,*
    948 F.2d 1338 (2d Cir. 1991).....................................................24

**New York State Cases**

*Aronson v. Wiersma,*
    65 N.Y.2d 592 (1985).........................................................13, 16

*Brian v. Richardson,*
    87 N.Y.2d 46 (1995)..........................................................13, 20

*Cook v. Relin,*
    280 A.D.2d 897 (4th Dep't 2001)..............................................14, 16

*DRT Constr. Co., Inc. v. Lenkei,*
    176 A.D.2d 1229 (4th Dep't 1991)...............................................13

*Frank v. National Broad. Co.*,
    119 A.D.2d 252 (2d Dep't 1986)............................................................13, 23

*Goetz v. Kunstler*,
    625 N.Y.S.2d 447 (N.Y. Sup. Ct. 1995)..............................................17, 18

*Gross v. New York Times Co.*,
    82 N.Y.2d 146 (1993)........................................................................12, 13

*Immuno A.G. v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991)...........................................................12, 17, 18, 20

*James v. Gannett Co.*,
    40 N.Y.2d 415 (1976).................................................................................13

*McGill v. Parker*,
    179 A.D.2d 98 (1st Dep't 1992).................................................................17

*Polish Am. Immigration Relief Comm., Inc. v. Relax*,
    189 A.D.2d 370 (1st Dept. 1993)...............................................................18

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977)................................................................................13

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
    86 A.D.3d 32 (1st Dep't 2011).................................................................22

*Shinn v. Williamson*,
    225 A.D.2d 605 (2d Dep't 1996)..............................................................13

*Springer v. Almontaser*,
    75 A.D. 2d 539 (2d Dept 2010)...................................................................5

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986).......................................................13, 14, 17, 20

*Wahrendorf v. City of Oswego*,
    72 A.D.3d 1604 (4th Dep't 2010).............................................................14

## Secondary Sources

### *Law Review Articles*:

William L. Charron, *Twitter: A 'Caveat Emptor' Exception To Libel Law?*,
    1 Berkeley J. Ent. & Sports L. 57, 62, 64 (2012)..........................................6, 23

Eirik Cheverud, Comment, *Cohen v. Google, Inc.*,
    55 N.Y. L. Rev. 333 (2010)..................................................................................22

Ira P. Robbins, *Guilty Without Charge: Assessing the Due Process Rights of
Unindicted Co-Conspirators*
    2004 Fed Cts. L. Rev. 1 (Jan. 2004).......................................................................7

Jennifer O'Brien, Note, *Putting a Face to a (Screen) Name: The First Amendment
Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet
Speakers in Online Defamation Cases,*
    70 Fordham L. Rev. 2745 (2002).............................................................................22

**Reports:**

Wajahat Ali, et al., *Fear, Inc.: The Roots of the Islamophobia Network in America,*
    The Center for American Progress, Aug. 2011...........................................................4

Robert Steinback, *The Anti-Muslim Inner Circle*, Intelligence Report
    Southern Poverty Law Center (Summer 2011)......................................................3, 4

**News Media:**

Ali Gharib, *Disgraced Terror Expert Says Boston Bombs Bear 'Hallmark'
of Muslim Radicals,*
    The Daily Beast, Apr. 16, 2013.............................................................................3

Eric Boehlert, *Terrorists Under the Bed,*
    Salon.com, Mar. 5, 2002.....................................................................................3

Victoria Brittain, *U.S. Muslims Guilty Until Proven Innocent,*
    Salon.com, June 10, 2013....................................................................................7

CounterPunch Wire, *Terror' Slut Steven Emerson Eats Crow (Just for Starters)
Withdraws Defamation Suit*, May 19, 2003..............................................................5

Michael Isikoff and Mark Hosenball, *Linking Groups to Holy Land Trial a Tactical Move,*
    Newsweek, Aug. 8, 2007....................................................................................8

Glenn Kessler, *The King Hearings: Is CAIR a 'Terrorist Organization'?,*
    washingtonpost.com, Mar. 10, 2011.......................................................................7

Neil MacFarquhar, *Muslim Groups Oppose a List of Co-Conspirators,*
    N.Y. Times, Aug. 16, 2007.................................................................................7

Solange Uwimana, *Fox Amplifies Discredited Anti-Islamic Activist Steve Emerson During Boston Coverage*
MediaMatters.org, Apr. 19, 2013.................................................................3

David Sarno, *Twitter Founder Jack Dorsey Illuminates the Site's Founding Document*,
L.A. Times Blog, Feb. 18, 2009.................................................................5

Robert Steinback, *Steve Emerson, Backing King Hearings, Pushes Misleading Statistic on Muslim Terrorism*,
Hatewatch, Southern Poverty Law Center Mar. 23, 2011.......................................4

John Sugg, *Steve Emerson's Crusade*,
Fairness & Accuracy in Reporting (FAIR), Jan. 1, 1999.......................................3

Jason Trahan, *U.S. Attorney in Dallas Says Obama's White House Didn't Meddle in Case*,
Dallas Morning News, Apr. 29, 2011.................................................................8

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEVEN EMERSON,

                              Plaintiff,

                                                          12 Civ. 8849 (TPG)

              -against -

CYRUS McGOLDRICK,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
### MOTION FOR JUDGMENT PURSUANT TO F.R.C.P. 12(C)

### PRELIMINARY STATEMENT

This libel lawsuit is the latest chapter in a years-old campaign on the part of plaintiff

Steven Emerson ("Emerson"), a self-annointed commentator on "terrorism" and a notorious

Islamophobe to malign and silence Muslim civil liberties groups and their allies. In this action,

he sues defendant Cyrus McGoldrick ("McGoldrick"), a young Muslim intellectual and civil

rights activist, for a sarcastic, mocking "tweet" that McGoldrick sent to two of his friends in

response to an article Emerson wrote attacking McGoldrick for his allegedly extremist political

views.

One of Emerson's favorite tactics in his anti-Islam smear campaign is to refer to

McGoldrick's former employer, the Council of American Islamic Relations ("CAIR"), as an "un-

indicted co-conspirator in the largest terrorist money laundering case in U.S. History." This

charge stems from a well-known federal case in which the U.S. Government, violating its own

policies, publicly listed CAIR (along with 244 other organizations) as an "unindicted co-

1

conspirator" in the course of a prosecution of a separate Muslim charity. Even though that designation was criticized as inappropriate by an appellate court, Emerson has persisted in labeling CAIR an "unindicted co-conspirator" in the funding of "terrorism" – deliberately distorting the legalistic phrase in an utterly demagogic way.

Responding to Emerson's dogged reliance on the "unindicted co-conspirator" canard, McGoldrick "tweeted" a sarcastic in-joke to two friends and colleagues mocking Emerson as "an unindicted co-conspirator in the largest child pornography case in US history." That joke is the sole basis for this suit. Because, understood in its full context, no one could have understood that joke as stating an actual fact about Emerson, the immutable pre-requisite of a viable libel claim – even a loyal supporter of Emerson publicly acknowledged the joke – judgment should be entered dismissing the Complaint at this time. This Memorandum of Law is respectfully submitted in support of McGoldrick's motion pursuant to F.R.C.P. 12(c) for judgment on the pleadings or, in the alternative, for summary judgment dismissing the Complaint in its entirety.

## STATEMENT OF FACTS

### A. The Parties

McGoldrick was a Civil Rights Manager and then an Advocacy Director of the Council of American Islamic Relations New York Chapter (hereinafter "CAIR-NY")[1] from January 1, 2011 until December 31, 2012. (Answer ¶ 2; McGoldrick Declaration ¶¶ 7, 8)  As set forth on its website, CAIR's mission is "to enhance the understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual

---

[1] CAIR has a national office and 29 active chapters, including CAIR-NY. Neither CAIR, nor McGoldrick's former employer CAIR-NY, is a party to this suit.

2

understanding." http://www.cair.com/about-us/vision-mission-core-principles.html. As the head

of CAIR-NY, it was McGoldrick's responsibility to manage the finances of the organization, to

organize its programs, and to be its public spokesperson. (McGoldrick Declaration ¶¶ 7, 8)

Emerson describes himself as a journalist and an expert on terrorism and Islam,[2] but he

has been discredited by the media and media watch groups as a "disgraced terrorism expert,"[3] a

"heavy-handed scaremonger,"[4] an "anti-Islam activist,"[5] and "poison."[6]  (Complaint ¶ 2) The

work of his organization, the Investigative Project on Terrorism has similarly been called into

question as little more than "big-lie propagandizing."[7] Emerson is affiliated with a group of

individuals and organizations that have made it their mission to smear Muslim individuals in

leadership positions and misrepresent Islam through a relentless media defamation campaign.

The Southern Poverty Law Center, a non-profit organization that reports on hate groups in the

United States, has reported that Emerson interacts with a group of activists that "doggedly

---

[2] Plaintiff Emerson is clearly a "public figure" for the purposes of this libel suit under applicable law. However, for the purposes of this motion his status as a libel plaintiff is not pertinent, because the alleged libel was not in context of a statement of fact, and thus simply not actionable.

[3] Ali Gharib, *Disgraced Terror Expert Says Boston Bombs Bear 'Hallmark'; of Muslim Radicals*, The Daily Beast, Apr. 16, 2013, *available at* http://www.thedailybeast.com/articles/2013/04/16/emerson-literally-forgets-ok-city-says-boston-bombs-bear-hallmark-of-muslim-radicals.html (Exhibit G to Ahmad Declaration)

[4] Eric Boehlert, *Terrorists Under the Bed*, Salon.com, Mar. 5, 2002, *available at* http://www.salon.com/2002/03/05/emerson/ (Exhibit G to Ahmad Declaration)

[5] Solange Uwimana, *Fox Amplifies Discredited Anti-Islamic Activist Steve Emerson During Boston Coverage*, MediaMatters.org, Apr. 19, 2013, http://mediamatters.org/blog/2013/04/19/fox-amplifies-discredited-anti-islamic-activist/193701 (Exhibit G to Ahmad Declaration)

[6] John Sugg, *Steve Emerson's Crusade*, Fairness & Accuracy in Reporting (FAIR), Jan. 1, 1999, *available at* http://fair.org/extra-online-articles/steven-emersons-crusade/. (quoting Seymour Hersh of The New Yorker) (Exhibit G to Ahmad Declaration)

[7] Robert Steinback, *Steve Emerson, Backing King Hearings, Pushes Misleading Statistic on Muslim Terrorism*, Mar. 23, 2011, *available at* http://www.splcenter.org/blog/2011/03/23/steve-emerson-backing-king-hearings-pushes-

...works to provoke and guide populist anger over what is seen as the threat posed by the 0.6% of

Americans who are Muslim — an agenda that goes beyond reasonable concern about terrorism

into the realm of demonization." Robert Steinback, *The Anti-Muslim Inner Circle*, Hatewatch,

Southern Poverty Law Center (Summer 2011), *available at* http://www.splcenter.org/get-

informed/intelligence-report/browse-all-issues/2011/summer/the-anti-muslim-inner-circle.

(Exhibit G to Ahmad Declaration)

The Center for American Progress, a non-partisan research institute, extensively profiled

Emerson in a report about the network of organizations and individuals dedicated to promoting

hateful propaganda towards Muslims. *See* Wajahat Ali, et al., *Fear, Inc.: The Roots of the*

*Islamophobia Network in America*, The Center for American Progress, Aug. 2011, *available at*

http://www.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf.

(Exhibit G to Ahmad Declaration). In this report, Emerson's brand of journalism and scholarship

is described as follows:

> Such wildly over-the-top portraits of Islam as inherently radical require some
> creativity on Emerson's part. Proving he's up to the challenge, Emerson boasts a
> history of fabricating evidence that perpetuates conspiracies of radical Islam
> infiltrating America through Muslim civil rights and advocacy organizations.

*Id.* at 49.

Emerson has previously turned to the courts to try to silence his critics. He filed a

defamation lawsuit against John F. Sugg, who was an investigative journalist with a Florida

newspaper, *The Weekly Planet*, and an *Associated Press* reporter, Richard Cole, for their

coverage of an incident in which Emerson allegedly provided reporters with a document on

---

misleading-statistic-on-muslim-terrorism/ (Exhibit G to Ahmad Declaration)

4

terrorism that supposedly came from FBI files, but which could not be verified and was suspected of being his own handiwork.[8] Eventually, Emerson withdrew the defamation suit. According to Sugg, "This lawsuit did not have any merit, and I believe it was filed in bad faith to deter us and others from telling the truth about Emerson. I think that 'pseudo-journalist' is a perfect description for Steven Emerson." *Id.*[9]

## B.  The November 19, 2012 Tweets

Twitter is a relatively new online forum that allows participants to engage in real-time conversations in which communications are limited to 140 characters (not words but characters) that are called "tweets." (Chavez Declaration ¶¶ 5, 10). In an interview, Twitter founder Jack Dorsey explained why that particular name was chosen: "Twitter" is defined in the dictionary as "a short burst of inconsequential information." David Sarno, *Twitter Founder Jack Dorsey Illuminates the Site's Founding Document*, L.A. Times Blog, Feb. 18, 2009, http://latimesblogs.latimes. com/technology/2009/02/twitter-creator.html. Sources or factual

---

[8] *See* CounterPunch Wire, *'Terror' Slut Steven Emerson Eats Crow (Just for Starters) Withdraws Defamation Suit*, May 19, 2003, *available at* http://www.counterpunch.org/2003/05/19/withdraws-defamation-suit/ (Exhibit G to Ahmad Declaration).

[9] Another target of this consortium of individuals was Debbie Almontaser, the former principal of an Arabic language school. *Springer v. Almontaser*, Index No. 14303/08, (Sup. Ct Kings County May 9, 2009), *aff'd* 75 A.D. 2d 539 (2d Dept 2010). After a very public smear campaign conducted by an *ad hoc* group called the "Stop the Madrass Coalition," Almontaser was forced to resign the post. In the course of this controversy, a defamation suit was filed against her for her statement, "Members of the coalition stalked me wherever I went and verbally assaulted me with vicious anti-Arab and anti-Muslim comments." The Second Department held, in words particularly apt here:

> The defendant's statement that she was stalked and harassed was not an actionable statement of objective fact because it did not have a precise, readily understood meaning, and would clearly be understood by a reasonable listener to be a figurative expression of how she felt as the object of the campaign.

*Id.* at 541

Emerson participated in the smear campaign against Almontaser using the "unindicted co-conspirator" label. *See* Steven Emerson, *Kind Words for Co-Conspirators*, Investigative Project on Terrorism, May 5, 2008, *available at* http://www.investigativeproject.org/661/kind-words-for-co-conspirators (Exhibit D to Ahmad Declaration).

support for statements are rarely provided, and a tweet is virtually synonymous with off-the-cuff, stream-of-consciousness remarks. *See* William L. Charron, *Twitter: A 'Caveat Emptor' Exception To Libel Law?*, 1 Berkeley J. Ent. & Sports L. 57, 62, 64 (2012).

Twitter users know that, because of its 140-character limitation, it is a "medium well-suited for expressing emotion and not for reasoned analysis." (Chavez Declaration ¶ 10). Because, like the rest of the internet, tweets can "essentially be published on impulse, and then revised immediately thereafter," Twitter users "do not expect from such communications the same degree of accuracy as if they appeared in print media or on radio or television." (Chavez Declaration ¶ 9). Accordingly, they think of tweets "as a matter of personal opinion [rather] than an assertion of fact." *Ibid.* Thus, they turn to "Twitter for stream-of-consciousness thoughts and for unguarded and unedited personal observations." *Ibid.* at ¶ 10.

On November 19, 2012, McGoldrick received a tweet from his friend and colleague, Linda Sarsour, addressed to him and Hussam Ayloush[10] that contained a link to an article by Emerson and Sarsour observed "damn these Islamophobes love us." (McGoldrick Declaration ¶ 10; Sarsour Declaration ¶ 18; Exhibit A to Sarsour Declaration; Ayloush Declaration ¶ 6). The Emerson article, which was written on or about November 17, 2012, criticized CAIR and other Muslim organizations and disparaged a tweet that McGoldrick had previously sent to his Twitter followers. *See* Steven Emerson, "Rockets? What Hamas Rockets?" *available at* http://www.familysecuritymatters.org/publications/detail/rockets-what-hamas-rockets (Exhibit A to Ahmad Declaration)

---

[10] Hussan Ayloush is the executive director of CAIR-Los Angeles. (Ayloush Declaration ¶ 3). Ms. Sarsour is the Executive Director of the Arab American Association of New York. (Sarsour Declaration ¶ 2).

On November 19, 2012, McGoldrick replied to Sarsour's tweet with this tweet to

Sarsour and Ayloush: "Steve Emerson is an unindicted co-conspirator in the largest child

pornography case in US history." (McGoldrick Declaration ¶ 16, Sarsour Declaration ¶ 9,

Ayloush Declaration ¶ 6)

## C. The *Holy Land Foundation* Case and the Term "Unindicted Co-Conspirator"

The phrase "unindicted co-conspirator" referenced in McGoldrick's tweet is a legalistic

term that is familiar to almost everyone who has been exposed to Emerson's campaign to

denigrate Muslim civil liberties organizations such as CAIR.[11] As relevant here, the term

originated in a prosecution, *United States v. Holy Land Foundation*, 3:04-CR-0240-P (N.D. Tex.

July 1, 2009), where the government listed 245 organizations, including CAIR, as "unindicted

co-conspirators." (Exhibit B to Ahmad Declaration)  In the criminal context, the term

"unindicted co-conspirator" is a legal device used by the government to allow hearsay statements

made by individuals not being prosecuted to be used at trial to prove the underlying criminal

case.[12]  Due to the potential for damaging the reputations of innocent parties without due

---

[11] Indeed, a number of news outlets have reported on the "unindicted co-conspirator" issue and it continues to receive a fair amount of publicity. *See, e.g,* Neil MacFarquhar, *Muslim Groups Oppose a List of 'Co-Conspirators'*, N.Y. Times, Aug. 16, 2007, available at
http://www.nytimes.com/2007/08/16/us/16charity.html?_r=0&pagewanted=print; Glenn Kessler, *The King Hearings: Is CAIR a 'Terrorist Organization'?*, washingtonpost.com,  Mar. 10, 2011,
http://voices.washingtonpost.com/fact-checker/2011/03/the_king_hearings_is_cair_a_te.html; Victoria Brittain, *U.S. Muslims Guilty Until Proven Innocent*, June 10, 2013, Salon.com,
http://www.salon.com/2013/06/10/muslims_guilty_partner/. (Exhibit E to Ahmad Declaration)

[12] As Professor Ira P. Robbins notes in a law review article, the inherent unfairness in the public naming of an individual or group as an "unindicted co-conspirator" is that "[t]he accoutrements of due process afforded an unindicted co-conspirator are more limited than those that are available to one named as a defendant…unindicted co-conspirators are labeled as criminals -- regardless of whether the defendants themselves are found guilty -- because the trial does not focus, and is not designed to focus, on evidence presented against them." Ira P. Robbins, *Unindicted Without Charge: Assessing the Due Process Rights of Co-Conspirators,* 2004 Fed Cts. L. Rev. 1 (Jan. 2004).

process, the government's policy is to keep the names of unindicted co-conspirators sealed.

Indeed, in *Holy Land Foundation*, the trial court found that the government had violated the Fifth

Amendment's due process protections by failing to seal this list because it had no "legitimate

interest" for releasing the names and because Muslim organizations had been harmed by this

violation. (Exhibit B to Ahmad Declaration, Mem. Opinion Order p. 12).  On review, the Fifth

Circuit agreed that the due process rights of the organizations had been violated by the release of

the list. 624 F.3d 685, 693-94 (5th Cir. 2010).

　　　No indictment has ever been issued against CAIR and the government later abandoned

the "unindicted co-conspirator" argument against organizations such as CAIR in the *Holy Land

Foundation* proceedings.[13] It has since been reported that the listing of CAIR and other Muslim

groups as "'unindicted co-conspirators" was largely "a tactical move" by the government.[14] In

his writings about the *Holy Land Foundation* proceedings, Emerson continues to avoid any

mention of the Fifth Circuit decision and has intentionally mischaracterized the government's

limited purpose in mentioning CAIR.[15]

---

[13] *See* Jason Trahan, *U.S. Attorney in Dallas Says Obama's White House Didn't Meddle in Case*, Dallas Morning News, Apr. 29, 2011, http://www.dallasnews.com/news/community-news/dallas/headlines/20110429-u.s.-attorney-in-dallas-says-obamas-white-house-didnt-meddle-in-case.ece. (quoting the attorney leading the *Holy Land Foundation* prosecution team, "The decision to indict or not indict a case is based upon an analysis of the evidence and the law…That's what happened in this case.") (Exhibit E to Ahmad Declaration)

[14] *See* Michael Isikoff and Mark Hosenball, "Linking Groups to Holy Land Trial A 'Tactical Move,'" *Newsweek*, Aug. 8, 2007, reprinted at http://www.archives2007.ghazali.net/html/linking_groups_tactical.html. (Exhibit H to Ahmad Declaration); *see also* Press Release, American Civil Liberties Union, ACLU Challenges Government's Stigmatizing of Mainstream Muslim Groups in Holy Land Case (June 18, 2008) (Exhibit E to Ahmad Declaration)

[15] *See, e.g.* Steven Emerson, *The New York Times Collaborates with Hamas Front Group to Suppress the Truth*, Jan. 25, 2012, http://www.steveemerson.com/11091/new-york-times-cair; Steven Emerson & John Rossomando, *Dems Tap Radical Islamists for Cash*, Investigative Project on Terrorism, Nov. 1, 2012, http://www.investigativeproject.org/3792/dems-tap-radical-islamists-for-cash; Steve Emerson, *CAIR Official Refuses To Condemn Hamas*, Nov. 30, 2010; http://www.newsmax.com/Emerson/cair-hamas-ahmed-rehab/2010/11/30/id/378467; Ruth King, *Steve Emerson and John Rossomando: Red Carpet for Radicals at the*

McGoldrick, CAIR, and other members of the Muslim community have sought to undo the double damage to their reputation caused first by the government's failure to seal its list of "unindicted co-conspirators" in the *Holy Land* case, and second by the onslaught of defamatory statements made by individuals like Emerson designed to propagate the inference that there has been any official finding implicating CAIR with criminality or terrorism.[16]

During the two years that McGoldrick worked at CAIR, the term "unindicted co-conspirator" assumed a darkly sardonic connotation because of its constant repetition by Emerson and others. The community of people at whom that term was aimed referred to the term on social media and Twitter as a kind of running ironic in-joke to mock those overblown, demagogic attempts to suggest that CAIR (among other similar organizations) had somehow actually been adjudicated as involved in a criminal conspiracy for funding terrorism. Virtually everyone familiar with CAIR is familiar with the unindicted co-conspirator issue. (McGoldrick Declaration ¶ 10 , Sarsour Declaration  ¶ 5; Ayloush Declaration ¶¶ 5,7).

**D. The Meaning of the Tweet to a Reasonable Twitter Follower**

Against this backdrop, it is clear that McGoldrick's "semi-private tweet" – it was sent only to Sarsour and Ayloush – was mocking Emerson's repeated invocation of the "unindicted

---

*White House*, www.InvestigativeProject.org, Oct. 22, 2012,  http://www.ruthfullyyours.com/2012/10/22/steve-emerson-and-john-rossomando-red-carpet-for-radicals-at-the-white-house/ (last visited July 15, 2013); Investigative Project News, *Federal Judge Agrees: CAIR Tied to Hamas*, Nov. 22, 2010, http://www.investigativeproject.org/2340/federal-judge-agrees-cair-tied-to-hamas; Steve Emerson, *State Dep't's Love Affair with Islamists*, The Jerusalem Post, http://www.jpost.com/Opinion/Op-Ed-Contributors/State-Departments-love-affair-with-Islamists (Exhibit D to Ahmad Declaration)

[16] *See* Top Internet and Conspiracy Theories About CAIR, CAIR, http://www.cair.com/about-us/dispelling-rumors-about-cair.html (last visited July 15, 2013); Christina Abraham, *Naperville Sun: Labels Are Inflammatory and Wrong*, CAIR-Chicago website, Apr. 21, 2010, http://www.cairchicago.org/2010/04/21/naperville-sun-labels-are-inflammatory-and-wrong/; Neil MacFarquhar, *Muslim Groups Oppose a List of Co-Conspirators*, Aug. 16, 2007, *available at* http://www.nytimes.com/2007/08/16/us/16charity.html?_r=0&pagewanted=print.(Exhibit E to Ahmad

co-conspirator" label and expressing a critique of the government's ability to name CAIR as an undicted co-conspirator without being put to any standard of proof. (Chavez Declaration ¶ 8) The tweet was not intended to state a fact about Emerson, nor would a reasonable reader of the tweet have thought otherwise. (McGoldrick Declaration ¶ 17) McGoldrick freely acknowledges that to the best of his knowledge Emerson is not a co-conspirator in any child pornography case. (McGoldrick Declaration ¶ 17) The tweet was part of an exchange between McGoldrick and two friends who understood and shared the mockery, sarcasm, and satire inherent in the tweet's use of the phrase "unindicted co-conspirator." Both Sarsour and Alyoush have submitted Declarations stating that they understood McGoldrick's tweet to be nothing more than mocking, sarcastic, and humorous. (Sarsour Declaration ¶ 9; Ayloush Declaration ¶ 7)  Moreover, the limited number of people who would have seen the tweet – and the Complaint is entirely speculative about how many people actually saw it, and provides no evidence that it was seen by anyone besides the two intended recipients – would have understood that the tweet was not intended to assert a statement of fact about Emerson. That is because the only other people to whom the tweet was potentially available, McGoldrick's "followers," are people who are well-informed about and interested in McGoldrick. Even his followers could only have seen the tweet by going to his personal page, and had any of them done so, they would have readily understood the context in which his tweet had occurred. (Chavez Declaration ¶¶ 6, 8)

That the joke was obvious to any reasonable reader of McGoldrick's tweet is apparent, not only from its own terms, but, more significantly, from a post that appeared on The Counter Jihad Report, a blog that shares Emerson's views and that has given Emerson a platform for his

Declaration).

opinions. On December 20, 2012, the author of the article, Ryan Mauro, discussed the filing of this lawsuit and explained the joke: "The tweet was mocking the often-mentioned fact that the organization McGoldrick serves, CAIR, is designated as an unindicted co-conspirator in the largest terrorism financing trial in U.S. History." (Exhibit C to Ahmad Declaration)  Given that the average reader of McGoldrick's tweet, his followers, would be well-informed about his ongoing battle with Emerson about CAIR, there is no reason to believe that any of them would have had any greater difficulty understanding its mocking nature than did Mauro.  He didn't think that McGoldrick was asserting a fact about Emerson, nor would anyone else. They, like Mauro, understand Twitter as a forum for the exchange of off-the-cuff expressions and "would not think that [McGoldrick] was serious in his assertion about Emerson." (Chavez Declaration ¶11).

In any event, as soon as McGoldrick learned that his tweet may have caused offense to Emerson, he removed it from his page. (McGoldrick Declaration ¶19).

**ARGUMENT**

## I. THE TWEET WAS NOT A FACTUAL ASSERTION BUT RATHER A MOCKING PRIVATE JOKE IN THE CONTEXT OF AN ONGOING POLITICAL PUBLIC DEBATE AND IT ENJOYS ABSOLUTE CONSTITUTIONAL PROTECTION

### A.   A Statement That is Not a Factual Assertion Cannot Support a Libel Claim

It is bedrock First Amendment law that a defamation action must be based on statements of objective fact. "The *sine qua non* of recovery for defamation . . . is the existence of falsehood. Justice Clark put it quite bluntly: 'the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.' Before the test of reckless or knowing falsity can be

11

met, there must be a false statement of fact." *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFLCIO, ("Letter Carriers)*, 418 U.S. 264, 283-286 (1974) (emphasis added).

Simply put, a statement that cannot be understood as a false assertion of fact cannot be actionable as defamation. While such non-factual statements are typically grouped under the rubric "opinion," they include many forms of non-factual speech such as "rhetorical hyperbole," "imaginative expression," or "loose, figurative, or hyperbolic language." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20-21 (1990). *See also Letter Carriers,* 418 U.S. 264, 285-86 (1974) ("lusty and imaginative expression"); *Greenbelt Co-op. Publ'g Ass'n. v. Bresler,* 398 U.S. 6, 14 (1970) ("vigorous epithet"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) ("parody").

While all these forms of "opinion" (broadly understood to include all forms of non-factual assertions) are protected by the United States Constitution, the protection afforded statements of "opinion" under New York law is even more expansive than that guaranteed by the First Amendment. The New York Court of Appeals has stated: "[U]nder our own State Constitution [this Court] . . . has embraced a test for determining what constitutes non-actionable opinion that is more flexible and is decidedly more protective [than the First Amendment] of 'the cherished constitutional guarantee of free speech.'" *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993) (internal citations omitted) (emphasis added). In drawing the line between fact and opinion, "[t]he dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [person] could have concluded that [the statements were] conveying facts about the plaintiff." *Gross*, 82 N.Y.2d at 153 (citation omitted); *accord Immuno A.G. v. Moor-Jankowski*, 77 N.Y.2d 235, 242-43 (1991), *cert denied*, 500 U.S. 954 (1991) (the "key inquiry" is whether

the challenged expression "would reasonably appear to state or imply an assertion of objective fact").[17]

Whether a statement is a non-actionable expression of opinion or an actionable factual assertion is a threshold question of law to be decided by the court. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986); *Gross* 82 N.Y.2d at 153; *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381 (1977). "The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (1985); *See also Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *Gross*, 82 N.Y.2d at 153).

Courts routinely grant pre-discovery motions dismissing libel claims on the ground that the allegedly defamatory utterances do not constitute the requisite factual statements. *See James v. Gannett Co.*, 40 N.Y.2d 415 (1976); *Shinn v. Williamson*, 225 A.D.2d 605 (2d Dep't 1996); *DRT Constr. Co., Inc. v. Lenkei*, 176 A.D.2d 1229 (4th Dep't 1991); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494 (S.D.N.Y. 2012).

## B. The Play on Words "Unindicted Co-Conspirator" Here Signaled That The Tweet Was Not Intended Literally, But as Mocking Sardonic Sarcasm

Courts applying New York law have repeatedly dismissed libel claims where the challenged statements were intended and understood as humor. *Frank v. National Broad. Co.*,

---

[17] Federal courts apply New York law in diversity defamation suits based on where the allegedly defamatory publication took place and where the defendant author resides. *See Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996) *aff'd*, 119 F.3d 189 (2d Cir. 1997). *See also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000).

119 A.D.2d 252 (2d Dep't 1986), citing *Triggs v. Sun Printing & Publ'g Assn.*, 179 N.Y. 144 (1904); *Netzger v. Continuity Graphics Assocs.,* 963 F. Supp. 1308 (S.D.N.Y. 1997); *Geary v. Goldstein,* 1996 WL 447776 (S.D.N.Y. Aug. 8, 1996). Courts recognize that the tone of humorous statements may be "ironic, sarcastic and caustic." *Cook v. Relin*, 280 A.D.2d 897, 898 (4th Dep't 2001). Thus, statements "intended to be invective expressed in the form of heavy-handed and nonsensical humor'" are protected. *Cook*, 280 A.D.2d at 898, quoting *Steinhilber*, 68 N.Y.2d 283, 293 (1986). *See also Wahrendorf v. City of Oswego*, 72 A.D.3d 1604 (4th Dep't 2010).

A case that exemplifies the First Amendment's protection of humor – even if crude and distasteful – is *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438 (10th Cir. 1982). There, the defendant magazine published an article purportedly chronicling a Miss America beauty pageant. The article was written from the perspective of "Charlene," a Miss Wyoming contestant, who bore a clear resemblance to plaintiff, and described her engaging in various explicit sexual acts during the pageant.

The Tenth Circuit did not fully appreciate the humor that the defendant claimed was at work in the article, but it still held that this was irrelevant to its First Amendment analysis. Citing Supreme Court precedents, the court held:

> The test [for defamation] is not whether the story is or is not characterized as 'fiction,' 'humor,' or anything else in the publication, but whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated. If it could not be so understood, the charged portions could not be taken literally.

695 F.2d at 443.

The court held that the descriptions in the article may have been a "gross, unpleasant, crude, distorted attempt to ridicule the Miss America contest and contestants" but they were "obviously a complete fantasy." *Id.* at 443. (The Tenth Circuit's opinion has been cited with approval by and in the Second Circuit: *See, e.g., Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 138 (2d Cir. 1984); *Netzer v. Continuity Graphic Assocs.*, 963 F. Supp. 1308, 1324 (S.D.N.Y. 1997)).

In *Geary v. Goldstein,* 1996 WL 447776 (S.D.N.Y. Aug. 8, 1996), Judge Wood concluded that it was error not to consider the full context of the allegedly defamatory speech in deciding whether to dismiss a libel action.  There, the speech at issue was a cable television parody of a popular television commercial, in which the plaintiff was featured. The parody spliced together segments of the original advertisement containing sexual innuendo with scenes of couples engaged in graphic sexual acts. The plaintiff claimed libel because of the juxtaposition of her likeness with that sexual content. Judge Wood originally sustained the claim, because a fleeting viewer might associate the plaintiff with the parody. But she subsequently reversed herself, holding that it was error to determine whether the parody was defamatory from the vantage-point of a channel-surfer who happened to tune-into the show:

> New York courts would recognize that to predicate liability for defamation on misimpressions garnered by a "channel-surfing" viewer is too dangerous to the rights of media speakers. Suppose, for example, that an hour-long television comedy program were to include in its broadcast a parodic, faux advertisement for one Presidential candidate, criticizing another candidate—the humor of which was so subtle that a channel-surfing viewer unfamiliar with the program could mistake it for an actual advertisement. Certainly the parodic advertisement should not give rise to a defamation suit by the criticized candidate when, interpreted in its proper context of the hour long comedy program, it did not defame.

Id. at *3.

15

Similarly here, Emerson posits a "channel-surfing" viewer of McGoldrick's tweet.  While Emerson suggests that the actual words in McGoldrick's tweet, stripped of its context, defame him – a fact that defendant vigorously denies – "the words must be construed in the context of the entire statement or a whole tested against the average reader," *Aronson v. Wiersma*, 65 N.Y.2d at 593, and no such reader would conclude that McGoldrick was making a factual assertion. The average reader of McGoldrick's tweet would be his "followers," who are well aware of his political views. That is why they are his followers. The average reader researching him on the internet would be equally aware of those views.  (Chavez Declaration ¶ 6) They would almost certainly know that his reference to Emerson as an unindicted co-conspirator would be related to the controversy surrounding CAIR and the *Holy Land Foundation* case. But even if they did not, such average readers would surely know that anything at all that McGoldrick said about Emerson would be in the context of their ongoing political feud, involving charges and counter-charges about the rights of Muslims. At the very least, the most casual of these readers would be clued into the humorous quality of the tweet.

McGoldrick's use of a parallelism, adopting a term that Emerson himself repeatedly uses and then turning it on its head, clearly signals that the tweet was intended as a mocking parody. McGoldrick's reference to "child pornography," a transgression so far-fetched and unrelated to the issues in dispute, also signaled that parody was intended. Courts recognize that statements "intended to be invective expressed in the form of heavy-handed and nonsensical humor'" are protected. *See Cook v. Relin*, 280 A.D.2d at 898. No reasonable reader could possibly have believed that McGoldrick had credible inside knowledge regarding a secret criminal investigation of the sort contained in his tweet. Indeed, a commentator for the blog, The Counter

16

Jihad Report, which espouses similar Islamophobic views as plaintiff Emerson, understood defendant's tweet as "mocking." (Exhibit C to Ahmad Declaration). This is damning evidence that the tweet was clearly farcical and a joke, and thus plaintiff's claim is meritless.

## C. That the Tweet Grew Out of an Ongoing Hostile Political Dispute Signaled That It Was Not a Factual Assertion, But an Opinion

As previously discussed, in determining whether a statement is an actionable factual assertion or non-actionable opinion, it is crucial to understand the context in which the statement was made. And that is especially true where the accused statement is made in the course of an ongoing dispute.

The New York Court of Appeals has held, "even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole.'" *Steinhilber*, 68 N.Y.2d at 294 (citations omitted); *Egiazaryan*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012).

It is crucial here that McGoldrick's tweet grew out of a charged political debate. As the Supreme Court observed in the context of a labor dispute, political debates are "frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions." *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 58 (1966) (citations omitted). People expect that public adversaries, especially those that debate on political or religious grounds, speak as advocates for their own cause in impassioned, hyperbolic and most certainly opinionated terms. Both sides to such debates "often speak bluntly and recklessly, embellishing their respective positions with

17

imprecatory language." *Letter Carriers,* 418 U.S. 264, 271 (1974), quoting *Linn,* 383 U.S. 53

(1966).  For this reason, in examining context courts also look to the status of the speaker as an

important indicator of whether the statement is asserted as one of opinion or objective, verifiable

fact. *See Immuno,* 77 N.Y.2d at 255; *see also, McGill v. Parker,* 179 A.D.2d 98, 110 (1st Dep't

1992) (statements in letters to government officials alleging that plaintiff mistreated his carriage

horses found to be protected opinion since they were clearly "expressed as part of an ongoing

controversy and designed primarily to persuade" government officials to adopt author's agenda);

*Goetz v. Kunstler,* 625 N.Y.S.2d 447, 450 (N.Y. Sup. Ct. 1995) (the fact that challenged

statements were contained in an autobiography of an "activist lawyer" signaled to the reasonable

reader that what is stated is a matter of opinion, "written from a subjective, rather obvious, point

of view"). The speech of a partisan advocate embroiled in a public controversy is very likely to

suggest to the reasonable reader that the speaker's statements are subjective.

    In *Letter Carriers,* the Supreme Court found that the use of words "scab" and "traitor" in

context of a labor dispute were "obviously used here in a loose, figurative sense to demonstrate

the union's strong disagreement with the views of those workers who oppose unionization." 418

U.S. at 267, 283-84. The Court stated, "[i]t is... impossible to believe that any reader of the

Carrier's Corner would have understood the newsletter to be charging the appellees with

committing the criminal offense of treason" by using the word "traitor." 418 U.S. at 285. In other

words, name-calling, epithets and harsh words are to be expected in this context and must

necessarily be taken with a large grain of salt.

    For example, courts have repeatedly held that where a term that might be capable of

accusing someone of criminal activity – such as steal, murder, crook, liar, forger, fraud – is used

18

in the course of a heated public debate, the term connotes a constitutionally protected expression of opinion. See, e.g., *Polish Am. Immigration Relief Comm., Inc. v. Relax*, 189 A.D.2d 370, 374 (1st Dept. 1993) (use of the phrase "thieves who should have been put to prison long ago" to describe plaintiffs in a letter to a small Polish newspaper was "clearly rhetorical hyperbole and vigorous epithet); *Goetz v. Kunstler*, 625 N.Y.S.2d 447, 452 (N.Y. Sup. Ct. 1995) (statements that plaintiff was a "murderous vigilante" who was "paranoid" and animated by "racism" were protected opinion); *Finkelstein v. Wachtel*, 2003 WL 1918309, *7 (S.D.N.Y. Apr. 21, 2003) (statements that plaintiff was a "crook" and that this was going to be a "very dirty business" were protected opinion, because the terms are "colloquial, loose, figurative terms that do not necessarily convey to the listener that plaintiff had, in fact, engaged in criminal behavior").

In *Immuno,* the New York Court of Appeals considered the defendants' status as impassioned animal rights advocates as one of the indicia informing readers that defendants' statements about the plaintiff corporation that conducted research on chimpanzees were opinions, not assertions of provable fact, 77 N.Y.2d at 255. As the Court noted, the letter "would not have been viewed by the average reader of the Journal as conveying actual facts about plaintiff." *Immuno*, 77 N.Y.2d at 255.  It is possible, the Court acknowledged, that if the statements were "studied long enough in isolation," they "could be found to contain implied factual assertions." However, "it would be plain to the reasonable reader of this scientific publication that [the author] was voicing no more than a highly partisan point of view." *Id.*

In *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494 (S.D.N.Y. 2012), Judge Castel granted defendant's motion to dismiss in a case involving an ongoing dispute between plaintiff, a Russian businessman seeking asylum in the United States, and defendant, the director of a New

19

York-based non-profit organization. Defendant allegedly wrote or assisted others in writing articles and advocacy letters painting plaintiff as "anti-American," "an anti-Semite," and "xenophobic." *Id.* at 498-499. Relying on New York case law, Judge Castel found that these statements were not libelous when considered in their context:

> Beginning with the broader context, the article appears in the 'opinion section'; of the newspaper. Turning to the immediate context, the article describes the author, Zalmayev, as the director of an organization "dedicated to fighting anti-Semitism and xenophobia," thereby "signaling that he was not a disinterested observer." The article appeared in the *Jewish Journal,* a "Jewish weekly," a choice of publication that seems calculated "to draw th[e] situation to the attention of interested parties," who bring to the article a "well-developed understanding of the issues" raised, While the tone of the article is undoubtedly serious, it is also rife with the "epithets, fiery rhetoric, [and] hyperbole," that signal advocacy. (*See* Ex. A, *Jewish Times* Article, at 1–2) (finding various assertions and viewpoints 'blasphemous,' 'repugnant,' 'reprehensible,' 'pernicious,' and 'insidious'; labeling Zhirinovsky 'infamous'; and coining phrase 'Zhirinovsky–Egiazaryan party').

880 F. Supp. 2d at 507, *citing, Brian,* 87 N.Y.2d at 54, *Immuno AG.,* 77 N.Y.2d at 254; *Steinhilber,* 68 N.Y.2d at 294.

In this instance, Emerson himself set the tone for a heated, emotional, and hyperbolic debate by charging McGoldrick and other Muslim activists with espousing extremist views. Followers of McGoldrick, who have a "'well-developed understanding of the issues' raised," *ibid.*, who happened to see his response, would know that it was not an objective statement of fact but instead a statement addressing Emerson's bombastic style of commentary.

McGoldrick's tweet followed countless other accusations by Emerson and his affiliates that organizations such as CAIR are linked to terrorism. (Exhibit D to Ahmad Declaration). Towards this end, Emerson has frequently relied on the government's listing of CAIR as an "unindicted co-conspirator" in the *Holy Land Foundation* case to malign Muslim organizations.

20

McGoldrick's tweet also highlighted the absurdity of this charge given that the government was never put to any standard of proof. The government can list anyone it wanted as an unindicted co-conspirator of a conspiracy for anything; it could even list Emerson as an "unindicted co-conspirator" in a conspiracy involving a child pornography ring. Thus, a reasonable viewer familiar to this debate would also understand McGoldrick's comment as a critique of the inherent unfairness of the government's conduct towards CAIR and other Muslim organizations in naming it publicly as an "unindicted co-conspirator" despite the obvious due process implications of this designation.

  Given that McGoldrick is a well-known Muslim civil rights activist who has repeatedly and publicly criticized Emerson for advocating that Muslims in this country should be subjected to special scrutiny by the government because of their purported extremism and ties to terrorism based on this kind of specious logic, no one would have believed that McGoldrick meant otherwise. (McGoldrick Declaration). *See Bentkowski v. Scene Magazine*, 637 F.3d 689, 695 (6th Cir. 2011) ("[defendant made] no attempt to hide his bias, and it would be unreasonable for a reader to view his comments as impartial reporting."). It is evident that Mauro, a commentator for a blog espousing similar views as Emerson understood this political context as he referred to it in his account of the news that Emerson had filed this lawsuit. Mauro stated, "The tweet was mocking the often-mentioned fact that the organization McGoldrick serves, CAIR, is designated, as an unindicted co-conspirator in the largest terrorism financing trial in U.S. History." (Exhibit C to Ahmad Declaration). The fact that Mauro understood the joke again undermines plaintiff's argument that the tweet was anything but an opinion expressing disdain and mockery for Emerson's views.

21

**D. Readers Understand That Statements on Twitter (and Other Forms of Internet Communication) Are Less Likely To Be Considered Statements of Fact**

An allegedly defamatory statement must be interpreted in the context of its publication. *See Netzger v. Continuity Graphics Assocs.*, 963 F. Supp. 1308 (S.D.N.Y. 1997). In determining whether readers of McGoldrick's tweet could reasonably have concluded that it was a factual assertion, it is essential to recognize that internet users do not presume the same accuracy of internet communications when compared with statements made in other fora. As one court has noted, "The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a "free-wheeling, anything-goes writing style." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43 (1st Dep't 2011), citing Eirik Cheverud, Comment, *Cohen v. Google, Inc.*, 55 N.Y. L. Rev. 333, 335 (2010). The *Sandals* court went on to note that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts." 86 A.D.3d at 44.

The *Sandals* court also approvingly quoted from another law review article that describes such internet chat-rooms and online bulletin boards as "the 'repository of a wide range of casual, emotive, and imprecise speech, and that the online 'recipients of [offensive] statements do not necessarily attribute the same level of credence to the statements [that] they would accord to statements made in other contexts.'" *Sandals Resorts Int'l Ltd.*, 86 A.D.3d at 43, citing Jennifer O'Brien, Note, *Putting a Face to a (Screen) Name: The First Amendment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases*, 70 Fordham L. Rev. 2745, 2774–2775 (2002) (internal citations omitted). In this law review article, the author noted that "[t]he low barrier to speaking online allows anyone with an

22

Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information. Often, this results in speech characterized by grammatical and spelling errors, the use of slang, and, in many instances, an overall lack of coherence." *Id.*

A federal court in California has acknowledged that the singular nature of internet forums suggests that the statements found there are not fact-based. "The statements were posted anonymously in the general cacophony of an Internet chat-room . . . . Importantly, the postings are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents . . . . To put it mildly, these postings lack the formality and polish typically found in documents in which a reader would expect to find facts." *Global Telemedia Int'l, Inc. v. Doe*, 132 F. Supp. 2d 1261, 1267 (C.D. Cal 2001). *See also Obsidian Fin. Group, LLC. v. Cox*, 812 F. Supp. 2d 1220, 1223, n.1 (D. Or. 2011) ("Blogs are a subspecies of online speech which inherently suggests that statements made there are not likely provable assertions of fact. . . . [A]n online blog is a 'frequently updated website consisting of personal observations, excerpts from other sources, or, more generally, an online journal or diary.'") (internal quotations omitted)

The case law concerning communications on Twitter, as one commentator has observed, reflects its founder's vision of Twitter as a medium that its users understand to be uniquely unsuited for the transmission of serious factual information. *See, e.g.,* William L. Charron, *Twitter: A 'Caveat Emptor' Exception To Libel Law?*, 1 Berkeley J. Ent. & Sports L. 57, 64 (2012) ("The lesson of cases like *Global Telemedia*, *Sandals*, and *Obsidian*, therefore, is that Twitter's characteristics and limitations should negate any expectations of a 'reasonable reader' that Twitter is a repository of stand-alone facts and unassailable 'truth.' To the contrary, Twitter

23

is a free-for-all marketplace for stream-of-consciousness thoughts and exclamations, and for

unguarded and unedited personal observations, discussions, and entertainment.")

Finally, what McGoldrick's Twitter audience expects from him is also relevant to the

context, *Frank v. Nat'l Broad. Co., Inc.*, 119 A.D.2d 252, 259 (1986), *citing Polygram Records*

*v. Superior Court*, 170 Cal. App. 3d 543, 547 (Cal. Ct. App. 1985) ("The court noted that the

audience "knew [defendant] as a comedian, not a wine connoisseur").

The Twitter exchange between McGoldrick and his colleagues Sarsour and Ayloush was

casual in tone. They were sharing and commenting on an article that Emerson had recently

written. The tone of the exchange was already sarcastic in Sarsour's tweet with the link to

Emerson's article, "damn these Islamophobes love us." Whatever the reader's knowledge of the

"unindicted co-conspirator" controversy, the reasonable interpretation of the tweet would be that

it was an "off the cuff" opinion between friends. No reasonable follower of McGoldrick's on

Twitter would have understood McGoldrick's tweet to be an objective reporting of a fact.


## II. THIS COURT MAY *SUA SPONTE* CONSIDER RULE 11 SANCTIONS FOR A FRIVOLOUS COMPLAINT FILED IN "BAD FAITH"

Rule 11 of the Federal Rules of Civil Procedure permits a district court to impose

sanctions "upon its own initiative," as long as notice and an opportunity to be hard are provided

to the sanctioned party. *See Sanko S.S. Co., Ltd. v. Galin*, 835 F.2d 51, 53 (2d Cir. 1987).

Sanctions can be imposed under Rule 11 against both the attorney and the client. *United States v.*

*International Bhd. of Teamsters, AFL-CIO*, 948 F.2d 1338, 1343 (2d Cir. 1991). Where a

complaint is brought in "bad faith," Rule 11 sanctions have been found to be warranted. *See*

24

*Tedeschi v. Barney*, 757 F.2d 465, 466 (2d Cir. 1985); *see also Gollomp v. Spitzer*, 568 F.3d 355, 369 (2d Cir. 2009).

Here, Emerson's counsel has filed a complaint that intentionally excludes material facts to the controversy at issue. These facts conclusively establish that neither Emerson nor any reasonable viewer of the exchange could have possibly believed that McGoldrick's tweet could be – much less was in fact -- understood as an actionable statement of objective fact. Furthermore, this action is obviously an attempt by Emerson to silence his critics, and as such it is in "bad faith" and constitutes abuse of process. It would be wholly appropriate for this Court to *sua sponte* consider Rule 11 sanctions given the circumstances present here.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated: July 16, 2013

/s
ALAN LEVINE (AL5297)
99 Hudson St., 14th Floor
New York, N.Y 10013
(212) 739-7506

Beena I. Ahmad (BA1115)
52 Duane St., 5th Floor
New York, NY 10007
(212) 571-7100

Hussan Ahmad (HA4708)
*Cooperating Attorneys with CAIR-NY*
Ahmad Naqvi Rodriguez, LLP
22 Cortlandt Street, 16th Floor
New York, NY 10007
(212) 419-0555

Stephen F. Downs (SD1171)
26 Dinmore Rd.
Selkirk, N.Y. 12158
(518) 767-0102

*Attorneys for Defendant Cyrus McGoldrick*

26